WO

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Nicholas Schreiber, | CV-14-2363-TUC-DCB |
| Plaintiff, | |
| v. | **FINAL ORDER** |
| Pima County, et al., | |
| Defendants. | |

Defendants' Motion for Summary Judgment/Partial Summary Judgment is before the Court. The Court previously entered an Order dismissing several Defendants, leaving Pima County, Pima County Sheriff's Department, and the Pima County Public Defenders Office as the remaining Defendants.[1] A Second Amended Complaint was filed on June 18, 2015 alleging violations of the ADA, Rehabilitation Act, Arizona Civil Rights Act, and Arizonans with Disabilities Act. The motion for summary judgment was filed in February 2017 and the parties requested oral argument. Oral argument was conducted on August 1, 2017.

During oral argument, the Court ruled from the bench that the motion for summary judgment (Doc. 52) is granted and this written

---

[1] Plaintiff does not contest dismissing the Sheriff's Department and the Public Defender's Office as Defendants, because the proper Defendant is Pima County in this instance. Defendants Sheriff's Department and Public Defender's Office will be dismissed with prejudice.

order clarifies and expands on that ruling. In addition, the Court ruled that the motion to strike the audio CD (Doc. 53) is granted and the Court indicated for the record that it had never listened to the audio CD (which will be returned to Defendants) and it does not constitute any basis for the Court's ruling on the motion for summary judgment.

**SUMMARY**

Schreiber is deaf. He was arrested by the Pima County Sheriff's Office, and appeared in the Superior Court in Pima County. Plaintiff's ADA/RA civil rights action focuses on the arrest (Sheriff's Department), the prosecution (Public Defenders Office) and the incarceration (Pima County Jail) as not having accommodated his disability and for treating him differently to his detriment than people with hearing.

**STANDARD OF REVIEW**

Summary judgment is proper where the pleadings, discovery and affidavits demonstrate that there is "no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery and affidavits that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Material facts are those that may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the

nonmoving party. *Id*. Where the moving party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). On an issue where the nonmoving party will bear the burden of proof at trial, the moving party can prevail merely by pointing out to the district court that there is an absence of evidence to support the nonmoving party's case. *Celotex*, 477 U.S. at 324-25.

If the moving party meets its initial burden, the opposing party must then set forth specific facts showing that there is some genuine issue for trial in order to defeat the motion. Fed. R. Civ. P. 56(c); *Anderson*, 477 U.S. at 250. All reasonable inferences must be drawn in the light most favorable to the nonmoving party. *Olsen v. Idaho State Bd. of Med.*, 363 F.3d 916, 922 (9th Cir. 2004). However, it is not the task of the Court to scour the record in search of a genuine issue of triable fact. *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996). The Court "rel[ies] on the nonmoving party to identify with reasonable particularity the evidence that precludes summary judgment." *Id.*; *see also Simmons v. Navajo Cty.*, Ariz., 609 F.3d 1011, 1017 (9th Cir. 2010). Thus, "[t]he district court need not examine the entire file for evidence establishing a genuine issue of fact, where the evidence is not set forth in the opposing papers with adequate references so that it could conveniently be found." *Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001). If the nonmoving party fails to make this showing, the moving party is entitled to a judgment. *See Celotex*, 477 U.S. at 323.

**DISCUSSION**

**A.  General ADA/RA Law**

     To establish a claim under the ADA, a plaintiff must show that he or she: (1) is an individual with a disability; (2) is otherwise qualified to participate in or receive the benefit of some public entity's services, programs, or activities; (3) was either excluded from participation in or denied the benefits of the public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (4) such exclusion, denial of benefits, or discrimination was by reason of his or her disability. Americans with Disabilities Act of 1990, § 202, 42 U.S.C.A. § 12132.

     To establish a claim under the Rehabilitation Act, a plaintiff must show that he or she: (1) is handicapped within the meaning of the Act; (2) is otherwise qualified for the benefits or services sought; (3) was denied the benefit or services solely by reason of his or her handicap; and (4) that the program providing the benefit or services receives federal financial assistance. Rehabilitation Act of 1973, § 504, 29 U.S.C.A. § 794. In claims for compensatory damages under either the ADA or the Rehabilitation Act, the law in the Ninth Circuit requires that a plaintiff show that a defendant had discriminatory intent. Id.

     A defendant must act with deliberate indifference; plaintiff is required to show discriminatory intent toward the plaintiff because of his or her disability, permitting an award of compensatory damages, only if: (1) the defendant has knowledge from which an inference could be drawn that a harm to a federally protected right is substantially

likely, and (2) the defendant actually draws that inference and fails to act upon the likelihood. *Id.* To show that a public entity had knowledge from which an inference could be drawn that a harm to a federally protected right was substantially likely, as required to demonstrate that the entity acted with deliberate indifference toward a plaintiff because of his or her disability in violation of the ADA and Rehabilitation Act, permitting award of compensatory damages, plaintiff must identify a specific, reasonable, and necessary accommodation that the entity failed to provide, and that the plaintiff notified the entity of the need for accommodation. *Id.*

"To recover monetary damages under Title II of the ADA or the Rehabilitation Act, a plaintiff must prove intentional discrimination on the part of the defendant." *Duvall v. County of Kitsap,* 260 F.3d 1124, 1138 (9th Cir.2001). In order to show intentional discrimination in the Ninth Circuit, the plaintiff must show that the defendant acted with "deliberate indifference." *Id.* at1138-39. "Deliberate indifference requires both knowledge that a harm to a federally protected right is substantially likely, and a failure to act upon that ... likelihood." *Id.* at 1139.; *Suarez v. Superior Court of California*, 283 Fed.Appx. 470, 471 (9th Cir. 2008). To show that a public entity inferred that harm to a federally protected right was substantially likely and failed to act upon the likelihood, as required to demonstrate that the entity acted with deliberate indifference toward a plaintiff because of his or her disability in violation of the ADA and Rehabilitation Act, permitting award of compensatory damages, plaintiff must show that the entity deliberately

failed to fulfill its duty to act in response to a request for accommodation. *Duvall*; *Updike v. City of Gresham*, 99 F.Supp.3d 1279 (D.Or. 2015)(failure to show deliberate indifference when preferred accommodation was not available, but alternative accommodation worked just as well).

**B. Arrest**

This lawsuit arises originally from Plaintiff's arrest and incarceration for domestic violence. (DSOF 1). Plaintiff ultimately plead guilty to the domestic violence charge. (DSOF 2).

On October 4, 2013, Plaintiff was at 4129 Alexandrite Avenue, where Plaintiff's wife, children and step children reside. (DSOF 3 & 4). Plaintiff was not living at the residence because of a pending child protection services investigation. (DSOF 5). Plaintiff had been accused of sexually assaulting one of his step daughters. (DSOF 6). Plaintiff was convicted of sexual abuse of a step daughter in June 2016. (DSOF 7). Plaintiff is currently in prison serving his sentence for the conviction. (DSOF 8).

On October 4, 2013, Plaintiff showed up at the residence without invitation or prior invite from his ex-wife, Cecilia Schreiber. (DSOF 9). At some point, there was an altercation between Plaintiff and his wife. (DSOF 11). During the altercation, Plaintiff threw his cell phone on the ground, which caused it to break into pieces. (DSOF 12). The altercation continued and at some point, Plaintiff slammed his wife against the wall, struck her and placed his hands around her throat causing red marks. (DSOF 13). These red marks were still visible 20-30 minutes after the incident, when viewed by the Pima

County Sheriff's Department. (DSOF 14). Based upon Cecilia Schreiber's report and the physical evidence at the scene, the Pima County Sheriff's Department determined that there appeared to be probable cause to arrest Plaintiff for domestic violence/criminal damage and domestic violence/assault. (DSOF 17).

Plaintiff argues that the Pima County Sheriff Department's Administrative Policies and Procedures require that when arresting a hearing impaired individual, the arresting officer "shall procure a qualified interpreter in order to properly do any of the following: 1. Administer *Miranda* warnings; 2. Interrogate the hearing impaired person; and 3. interpret the hearing impaired person's statements." Exhibit C, Administrative Policies and Procedures. When Plaintiff was placed in police custody, his hands were handcuffed behind him, preventing him from signing or writing. Exhibit A, pg. 35, ln. 23-24; pg. 46, ln. 2-5. The Pima County Sheriff's Department's internal investigation into a complaint filed by Plaintiff found that Correction Sergeant Crystle Prosser, who was working as a housing liaison at the time of Plaintiff's incarceration, believed that the TTY machine at the jail was "not working." Exhibit D, Pima County Sheriff's Department Memorandum. Plaintiff complained in writing on at least three separate occasions that the TTY machines were not working. *Id.* at pg. 3. Plaintiff communicated with Sean Bruner, his public defender, primarily by exchanging written notes back-and-forth on paper and on Mr. Bruner's iPad. *Id.* pg. 81, ln. 11-15. Plaintiff asked Mr. Bruner repeatedly to get an ASL interpreter for their meetings, but Mr. Bruner refused. *Id.* ln. 16-20; pg. 83, ln. 11-14;

Exhibit B, pg. 30, ln. 2-8; pg. 31, ln. 8-13; pg. 33, ln 2-17. Because of this, Plaintiff alleges that he did not understand the plea deal that was offered to him by the prosecutor. Exhibit A, pg. 82, ln. 1 – pg. 83, ln. 14. Plaintiff felt pressured and rushed to sign the plea agreement, despite not fully understanding it. *Id.* pg. 85, ln. 15 – pg. 88, ln. 25.

On November 13, 2013, Plaintiff filed a complaint with the Pima County Sheriff's Department, complaining that he was arrested and jailed for 25 days without benefit of an ASL interpreter except in Court. Exhibit D. He complained that the TTY machines in the jail did not work. *Id.* pg. 2. He complained that his public defender attempted to meet with him over the jail's telephone/video system. *Id.* He complained that he should have been granted an interpreter for his statement to police and during the booking process. Id. He complained that he did not have access to a functioning TTY machine at the jail. Id. An investigation into Plaintiff's complaint determined that that Pima County Sheriff's Department employees involved in his case "took reasonable measures to communicate" with him. Exhibit E, December 24, 2013 letter from David Peru to Nicholaus Schreiber.

Plaintiff alleges a violation occurred at the scene of the arrest when he was interviewed by Deputy Mitchell. Deputy Mitchell had asked to speak with Plaintiff (DSOF 31). At the start of the communication with Plaintiff, Deputy Mitchell showed Plaintiff his Pima County Sheriff Department Quick Reference Guide which contains the *Miranda* Rights. (DSOF 32). While Plaintiff was reading the *Miranda* Rights, Deputy Mitchell verbally went through each right with Plaintiff. (DSOF

- 8 -

33). When necessary Deputy Mitchell would explain or give examples to Plaintiff. (DSOF 34). Plaintiff told Deputy Mitchell that he understood his rights and was willing to speak with Deputy Mitchell. (DSOF 35). Deputy Mitchell was of the opinion that he was able to effectively communicate with Plaintiff while discussing the *Miranda* Rights. (DSOF 36). Deputy Mitchell noticed that Plaintiff had a hearing aid in his left ear (DSOF 21). Deputy Mitchell also noticed that during the conversation, Plaintiff would put his left ear toward Deputy Mitchell but was also concentrating on his face (DSOF 22). It was Deputy Mitchell's opinion that Plaintiff was reading lips and listening to him at the same time. (DSOF 23). Deputy Mitchell testifies that Plaintiff understood his statements and responded appropriately to those statements. (DSOF 37). At no time did Plaintiff ask for an interpreter or to communicate in any other manner. (DSOF 38). At no time did Plaintiff ask that his handcuffs be removed so he could use sign language. (DSOF 39). Plaintiff did ask that the air conditioning be turned off so he could hear better. (DSOF 40). Deputy Mitchell turned the vent off as requested by Plaintiff. (DSOF 41). It is Deputy Mitchell's opinion that during the entirety of the statement, he was able to effectively communicate with Plaintiff. (DSOF 42).

Sheriff's deputies made a decision to arrest Plaintiff based on his wife's statements to them about what happened. CSOF ¶ 17. They went in search of Plaintiff, located him, took custody of him, and brought him back to the residence. SOF ¶¶ 18-19. They handcuffed his hands behind his back, such that he could neither communicate in his

first language, American Sign Language ("ASL"), nor by way of written notes. AMF ¶ 138. He tried to communicate verbally with the officers, but he struggled to speak more than a few words. CSOF ¶ 20. He felt "really frustrated" with his inability to communicate with the officers. AMF ¶ 140. Sometime later, when he saw a transcript of his recorded conversation with officers, the words in the transcript attributed to him did not reflect what he tried to say. AMF ¶ 141. Plaintiff attempted to request an ASL interpreter during questioning. CSOF ¶ 25. Plaintiff did not understand his Miranda rights as they were explained to him in English by Deputy Mitchell. CSOF ¶¶ 32-34.

Nonetheless, Pima County asserts that Plaintiff does not have any rights to auxiliary aids at the scene of the arrest. It has been held that police are not required to provide auxiliary aids prior to arrival at the stationhouse or prison. *Rosen v. Montgomery County*, 121 F. 3d. 154 (4th Cir. 1997). It would be impractical and an undue burden to require others to retain an interpreter at the scene of a crime.

Plaintiff may not substitute this civil action for an appeal from his criminal conviction, consequently harm or injury derived from the allocution and during the plea agreement negotiation are not the kind of harm contemplated by the ADA or RA.[2] "Disappointed state court litigants sometimes attempt to overturn state court rulings in federal

---

[2] Judge Bernini questioned Plaintiff to make sure that he understood the charges, the terms and conditions of the plea agreement, the possible consequences thereof and the constitutional rights he waives by entering the plea. (Exhibit 15). Judge Bernini found that Plaintiff knowingly, voluntarily and intelligently entered into a plea agreement for domestic violence and that there was a factual basis for the plea. (Exhibit 15).

court § 1983 actions." 1 Martin A. Schwartz, *Section 1983 Litigation* § 1.07[B] (4th ed.2003). "This endeavor is frequently doomed to failure." *Id.* Under the *Rooker–Feldman* doctrine, lower federal courts do not have subject matter jurisdiction to conduct appellate review of state court proceedings. *Rooker v. Fidelity Trust Co.,* 263 U.S. 413, 416 (1923); *D.C. Ct.App. v. Feldman,* 460 U.S. 462, 482 (1983). The doctrine applies not only to claims that were actually raised before the state court, but pursuant to res judicata and collateral estoppel, also to claims that are "inextricably intertwined" with state court determinations. *Feldman,* 460 U.S. at 483 n. 16; *see also Noel v. Hall,* 341 F.3d 1148 (9th Cir.2003). *Rooker–Feldman* requires a party seeking review of a state court judgment to pursue relief through the state court system and ultimately to the United States Supreme Court.[2] *See* 28 U.S.C. § 1257; *Rooker,* 263 U.S. at 416; *Feldman,* 460 U.S. at 476. The doctrine stems in part from a recognition of the fact that "a decision by a state court, however erroneous, is not itself a violation of the Constitution actionable in federal court." Plaintiff's claims are a *de facto* appeal of the proceedings in state court, which he could have appealed. Any challenge he had to the reading of his rights, failure to knowingly and intelligently enter a plea could have been raised on appeal but were not and barred here under *Rooker-Feldman.* As to the ADA/RA claims, there are no material questions of fact precluding resolution by summary judgment here.

**C. Prosecution**

   Plaintiff admits that the State provided him with an ASL interpreter when he appeared in Arizona Superior Court. (Doc. 24, ¶

32.) Plaintiff's complaint with the State was that Superior Court Judge Deborah Bernini could not order that an interpreter be provided at the Pima County Jail or at the Pima County Public Defender's Office.[3] The Superior Court provided him with an ASL interpreter in the courtroom. Plaintiff claims he was entitled to an interpreter outside of the courtroom setting.

ADA, Title II and its implementing regulations require that a public entity "furnish appropriate auxiliary aids and services" to individuals with disabilities so that they have "an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity of a public entity." 28 C.F.R. § 35.160(b)(1); *see also* 42 U.S.C. § 121312 ("[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity."). The Ninth Circuit has interpreted the phrase, "services, programs, or activities" to include "anything a public entity does." *Barden v. City of Sacramento,* 292 F.3d 1073, 1076 (9th Cir. 2002) (quoting *Lee v. City of L.A.,* 250 F.3d 668, 691 (9th Cir. 2001)). "Whether a particular public function is covered by the ADA turns simply on whether it is 'a normal function of a governmental entity.'" *Fortyune v. City of Lomita,* 766 F.3d 1098, 1102 (9th Cir. 2014) (quoting *Bay Area Addiction Research & Treatment v. City of Antioch,* 179 F.3d 725, 731 (9th Cir. 1999)). Title II requires that the State make its courtrooms accessible to individuals with disabilities, including by providing auxiliary aids and services where

---

[3] All state and judicial defendants have been dismissed from this action.

appropriate to allow those individuals to participate fully in courtroom proceedings. Plaintiff admits that the Superior Court agreed to provide him with the auxiliary aid and service of sign language interpretation in the courtroom. (Doc. 24, ¶ 32.) And he does not allege that he was ever denied an interpreter in court. Ensuring that parties can adequately prepare with their counsel outside the courtroom, however, is not a normal function of the Arizona Superior Court.

In sum, Title II does not require the State to provide sign language interpretation for Plaintiff's meetings with counsel at the Pima County Jail or at the Pima County Public Defender's Office. Plaintiff has cited no legal authority for a different conclusion. Attorney Bruner made clear that he opined his communications with Plaintiff were reasonable and effective and that an interpreter was not needed. Plaintiff complains that without an interpreter that he did not understand the plea agreement. However, Plaintiff was given a copy of the plea agreement prior to the hearing. It is uncontroverted that Plaintiff could read, write, graduated from high school and in fact, took classes at Pima County. Further, Plaintiff met with Bruner and an interpreter at the courthouse, prior to his entering a guilty plea. Attorney Sean Bruner testified that in general costs are a factor in defending a case. However, Mr. Bruner consistently testified that he did not retain an interpreter for this case because in his opinion there was always effective communication between himself and Plaintiff. (Exhibit 13, P. 46 L. 10 to P. 48 L. 4).

Even taken in a light most favorable to the nonpleading party,

the evidence is such that communications with Plaintiff's attorney were not so lacking as to cause injury. Again, any claims here that are a substitute for a criminal appeal are barred by *Rooker-Feldman*.

**D. Incarceration**

Plaintiff complains that he was unable to use the telephone while incarcerated at Pima County Jail. However, Plaintiff did not make such a complaint for the last two weeks of his incarceration. Further, Plaintiff was offered help to use the TTY machine and refused (DSOF 91). The call log shows that Plaintiff successfully made telephone calls while in prison. (DSOF 134). The corrections officers helped Plaintiff get in contact with his public defender. (DSOF 95). There is no evidence or claim that Plaintiff was unable to contact anyone else other than his wife, who he was prohibited from speaking with. (DSOF 92-93).

The evidence shows that the County jail had multiple TTY machines and Plaintiff has not provided any evidence that the TTY machines did not work for any other hearing impaired prisoner. Further, Plaintiff only complained three times within the first few days of his incarceration. Plaintiff never complained after that time that the TTY machines were not working including during his second incarceration. The evidence also shows that numerous detention center employees tried to help him use the TTY machine. For example, Ms. Hyman testified that Plaintiff was not interested in using the TTY machine and only wanted a cell phone to call his wife. (DSOF 91). Further, the Call Log from the PCADC indicates that Plaintiff successfully made telephone calls on several occasions including on October 8 and 11, 2013. (DSOF 134).

Therefore, Plaintiff either successfully used the TTY machine or used the regular telephone to make such calls.

On October 8, 2013, Plaintiff complained to Sergeant Gomez that the TTY machine was not working. (DSOF 83). Also present was Sergeant C.W. Cooper. Sergeant Cooper observed Gomez and Plaintiff using written communication. (DSOF 84). In Sergeant Cooper's opinion, the communication between Cooper and Plaintiff seemed reasonable effective. (DSOF 85). Sergeant Cooper observed that at no time did Plaintiff request an interpreter or ask to use any other time of communication. (DSOF 86). Sergeant Cooper attempted to help Plaintiff use the TTY machine. (DSOF 87). Cooper recalls that the TTY machine was not working on that occasion but recalls that the problem was that they could not get sufficient power to it. (DSOF 88). Since the officers were not able to get the machine to work on that occasion, Sergeant Gomez took Plaintiff to Specialist Hyman so that Plaintiff could make a phone call. (DSOF 89).

On the contrary, Plaintiff claims he tried to call his public defender, Sean Bruner, using a TTY at the jail, but it did not work, despite repeated attempts. CSOF ¶ 73. Plaintiff complained in writing about the TTY machines not working at least three times before finally giving up on making a call from jail. AMF ¶¶ 143-45.

Ms. Hyman recalls seeing Plaintiff on October 8, 2013. Ms. Hyman recalls that she was told that Plaintiff was being brought to her office because they were having trouble getting power to the TTY machine. (DSOF 90). Ms. Hyman offered to set up the TTY machine but it appeared to her that Plaintiff was not interested in using the TTY

machine. (DSOF 91). Plaintiff only requested a cell phone and wanted to call his wife, Cecelia. Ms. Hyman informed Plaintiff that he was not able to call his wife because of the charges for domestic violence. (DSOF 92). Ms. Hyman asked Plaintiff if he wanted to contact any other family members of friends. Plaintiff did not give her any other names to call. (DSOF 93). Plaintiff did ask her to call his public defender. (DSOF 94). Ms. Hyman called the Public Defender's Office but Plaintiff's lawyer was not available. Ms. Hyman left a message for the lawyer to contact Plaintiff. (DSOF 95).

Initially, it should be noted that Plaintiff has not provided any written custom or policies from Pima County. Further, Plaintiff has not provided any evidence or testimony from a policymaker at Pima County. Plaintiff's only two allegations are that the TTY machine didn't work for Plaintiff and that the Pima County Defender's Office did not retain the services of an interpreter for him. However, the evidence shows that the PCADC had multiple TTY machines and Plaintiff has not provided any evidence that the TTY machines did not work for any other hearing impaired prisoner. Further, Plaintiff only complained three times within the first few days of his incarceration. Plaintiff never complained after that time that the TTY machines were not working including during his second incarceration. The evidence also shows that numerous detention center employees tried to help him use the TTY machine. For example, Ms. Hyman testified that Plaintiff was not interested in using the TTY machine and only wanted a cell phone to call his wife. (DSOF 91). Further, the Call Log from the PCADC indicates that Plaintiff successfully made telephone calls on

several occasions including on October 8 and 11, 2013. (DSOF 134).
Therefore, Plaintiff either successfully used the TTY machine or used
the regular telephone to make such calls.

**E.   ADA Claim against the County (Count I)**

At issue is whether Pima County effectively communicated with
Plaintiff without the assistance of an auxiliary aid. Sign language
interpreters are not required when lip reading or other accommodations
are sufficient. *Board of Educ. of Hendrick Hudson Sch.Dist. v. Rowley*,
458 U.S. 176 (1982). Plaintiff argues that whether the communication
was effective is a fact intensive inquiry not resolvable by a
dispositive motion. While that may be so, that does not mean that
summary judgment cannot be granted when the facts show effective
communication. *See Bircoll v. Miami-Dade Cty.*, 480 F.3d 1072 (11th
Cir. 2007) (the court found summary judgment warranted on the issue of
effective communication even though factual issues existed whether the
prisoner asked for an interpreter). Effective communication does not
mean identical results, just meaningful interaction.

In the case at hand, Defendants argue that the audio recording[4]
and the testimony from the Pima County employees conclusively
establishes that Plaintiff effectively communicated with Pima County
employees. There is no evidence of deliberate discrimination when
Deputy Mitchell took a statement from Plaintiff. Plaintiff's self-
serving statements at deposition do not create a material issue of

---

[4] The audio CD lodged and filed in this action will be stricken
from the record.  It was not heard by the Court and does not provide
any basis for this Court's ruling.  The audio CD will be held in the
event of appellate review even though was not used as part of the
Court's decision making process.

fact to prevent entry of summary judgment. The evidence supports that Plaintiff was responsive to Mitchell's questions and statement, proving effective communication.

Despite Nick's repeated requests for an interpreter for his meetings with Mr. Bruner, the public defender's office refused to provide one, in part because of the cost. AMF ¶¶ 148-49, 162-64. Mr. Bruner, believing that Nick was entitled to an interpreter for his meetings with his attorney, did file a motion requesting that the Court provide an interpreter, but the motion failed. AMF ¶¶ 163-65. Plaintiff testified that because of all this, he felt pressured to sign a plea agreement he did not fully understand. AMF ¶¶ 150-51.

There is no evidence that an interpreter was not at any meetings with Bruner because of cost. Bruner testified that he spoke with Ms. Lefferts, who stated in her experience she had been able to effectively communicate with hearing-impaired individuals without an interpreter. (DSOF 118 & 119) Bruner continually testified that he communicated effectively with Plaintiff and that an interpreter was not necessary. (DSOF 109, 110, 111, 112, 113, 117, 120, 124, 127). Bruner did acknowledge that budgetary concerns were always present at his office; however, he nor Ms. Lefferts ever testified that an interpreter was not hired in this case because they did not want to spend the money. (DSOF 169).

Taking all of the facts as true, there is no violation of the ADA or RA, particularly because there is no direct or inferred evidence of deliberate indifference and discrimination on the part of the public entities named in this action and there is evidence that the

Defendants acted reasonably under the circumstances. This resolves Counts I and III.

**F.   Section 1983: Sheriff's Office, County Jail, Public Defender (Count II)**

In order to sustain a claim under 42 USC § 1983, Plaintiff "must show that the [Defendants] acted under color of law, and that their conduct deprived him of a constitutional right." *Duffy v. Riveland,* 98 F.3d 447, 456 (9th Cir. 1996) (reversing summary judgment against a deaf inmate on his ADA, Rehabilitation Act and Section 1983 claims). In order to prevail on his section 1983 claim, Plaintiff will also need demonstrate that Defendants have customs or policies which amount to deliberate indifference to his constitutional rights. *Lee v. City of L.A.,* 250 F.3d 668, 681 (9th Cir. 2001). Deliberate indifference occurs when the need for more or different action is so obvious, and the inadequacy of the current procedure so likely to result in a violation of constitutional rights, that the policymakers can reasonably be said to have been deliberately indifferent. *Id.* at 682 (citation omitted). Whether a local government entity has displayed such a policy of "deliberate indifference" is generally a question of fact for the jury. *Id.* Here, Plaintiff alleges that he requested an interpreter at virtually every turn – when he was arrested and his statement was taken, when he was booked, when he met with his public defender – and he was consistently denied. He alleges that he complained repeatedly about the TTY machines not working and nothing was done to remedy the situation. From this evidence, Plaintiff argues that there is enough material evidence that a jury could conclude that

Defendants displayed a pattern of "deliberate indifference" toward the hearing impaired.

A Section 1983 claim cannot be used to enforce rights under the ADA or the Rehabilitation Act since both contain statutory schemes that already include comprehensive remedial measures. *Vinson v. Thomas*, 288 F.3d 1145 (9th Cir. 2002). The *Vinson* court relied on the holding in *Holbrook v. City of Alpharetta*, 112 F.3d 1522 (11th Cir. 1997), which found that a plaintiff, who was suing a city, could not maintain a Section 1983 in lieu or in addition to a Rehabilitation/ADA cause of action when the alleged violation is covered by the Rehabilitation Act and the ADA. Other district courts have agreed with this reasoning. *See Hill v. Baca*, No. CV 08-03834 CAS (C.D. Cal 2006). Section 1983 does not provide a cause of action to vindicate statutory rights under the ADA. *Save Our Summers v. Wash. State Dep't. of Ecology*, 132 F. Supp. 2d 896 (Wash. 1999) (Section 1983 cannot be used to enforce rights created by a statutory scheme that already included comprehensive remedial measures).

In the Section 1983 claim, Plaintiff asserts that he is a qualified individual under Title II of the ADA. (DSOF 154). Plaintiff complains that his constitutional rights were violated because he was not given the services of an interpreter. (DSOF 155). Finally, Plaintiff alleges the same damages as in the causes of action pursuant to alleged violations of the ADA and 504 of the Rehabilitation Act. (DSOF 152). Plaintiff is asserting rights under his Section 1983 claim that are covered by the ADA and Rehabilitation Act. As such, the Section 1983 claims are precluded by the ADA and Rehabilitation Act.

Plaintiff does not respond to this case authority.

Even assuming that a Section 1983 cause of action exists in conjunction with ADA/RA claims, Plaintiff has not provided any evidence to prove his 1983 claim. Since Pima County is the defendant in this case, Plaintiff must show a policy or custom and practice of the alleged violation of denying interpreters to hearing impaired persons. *Monell v. Dept. of Social Services*, 436 U.S. 658 (1978). Plaintiff has produced no evidence to support any policy or custom and practice on behalf of Pima County. Plaintiff has not provided any written custom or policies from Pima County. Plaintiff has not provided any evidence or testimony from a policymaker at Pima County. Plaintiff's only two allegations are that the TTY machine did not work for Plaintiff and that the Pima County Defender's Office did not retain the services of an interpreter for him.

Plaintiff's allegations do not support a claim for deliberate indifference. Deliberate indifference requires that a different action be obvious and that the inadequacy of the current procedure is likely to result in a violation of constitutional rights. Any problems with the TTY machine appeared to be an isolated incident and cannot constitute a policy or procedure. Especially, since Pima County actually had a policy to provide the use of the TTY machine, had multiple TTY machines and continually attempted to help Plaintiff to use the machine. Also, there is no evidence that there was non-effective communication between Plaintiff and his lawyer. Plaintiff's only complaint that he didn't understand his plea agreement is dubious since he read a copy prior to the hearing, met with his attorney prior

to the hearing, met with his attorney and interpreter prior to changing his plea and that the court noted that Plaintiff understood and accepted the plea agreement. Therefore, there is no evidence of deliberate indifference.

In cases involving hearing impairment, the issue is whether the communication was effective. A public entity needs only to take appropriate steps to ensure that the communication with members of the public with disabilities are as effective as communications with others. 28 CFR 35.160(a). Although a public entity may be required to make available appropriate auxiliary aids where necessary for effective communications, the type of auxiliary aid necessary to ensure effective communication will vary in accordance with the length and complexity of the communication involved. 28 CFR 35, 160(a)(2); *Department of Justice Technical Assistance Manual on the Americans with Disabilities Act* III-4-3200. Auxiliary aids include the use of written communication. Id. Further, the reasonable modification principle does not require a public entity to employ any and all means to make auxiliary aids accessible but only make reasonable modifications that would not fundamentally alter the nature of the service of the public entity or impose and undue burden.

Pima County contends that at all times they effectively communicated with Plaintiff either verbally or through written means Plaintiff admits that he reads well and has been reading books most of his life. (DSOF 135). Plaintiff indicates that he communicates with his family through verbal and written methods. (DSOF 136). Plaintiff also acknowledges that he communicates through text and through e-mail

(DSOF 137, 139). Plaintiff has a high school degree and went to Pima College for a year and a half studying writing and reading (DSOF 140, 141). Nonetheless, Plaintiff alleges that he should have been given an interpreter. However, the Supreme Court has held that sign language interpreters are not required when lip reading or other accommodations are sufficient. Board of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458 US 176, 102 S. Ct. 3034 (1982).

Pima County contends that there was effective communications at all times while Plaintiff was in the Pima County Adult Detention Center. Plaintiff was incarcerated in the Pima County Adult Detention Center from October 5, 2013 through October 24, 2013. (DSOF 66). Prisoner use of the telephone during incarceration is allowed but limited. (DSOF 67). The procedure for using the telephone is contained in the *Prisoner Handbook* (DSOF 68). The handbook also informs a prisoner that if they have trouble using the telephone that the prisoner should either submit a phone trouble report, speak with a pod officer or submit an assistance request form. (DSOF 69). Additionally, for hearing impaired prisoners, the detention complex has TTY machines. (DSOF 70). A TTY machine allows the hearing-impaired person to type his communications to the other person and to receive the other person's communication by text. (DSOF 71). Pima County had a procedure regarding the use of TTY machines. (DSOF 72). Plaintiff did make some complaints regarding the use of the TTY machine on October 6th and 8th. (DSOF 73). Plaintiff did not make any complaints regarding the use of telephones or the TTY machine after October 8, 2013. (DSOF 74).

The evidence shows that at all times while at the Pima County Adult Detention Center Plaintiff was able to effectively communicate with the correction officers. Additionally, there was no evidence that Plaintiff suffered any injury as a result of any lack of communication. Plaintiff was in communication with his lawyer. He was prohibited from contacting his wife and children. Plaintiff has not alleged that he was unable to contact anyone else.

Pima County also contends that Plaintiff was able to communicate effectively at all times with his public defender Sean Bruner. It was determined that Plaintiff would be represented by the Public Defender's Office and attorney Sean Bruner was assigned to Plaintiff's case. (DSOF 99). Mr. Bruner cannot recall whether he received notice on October 7th or the next day, October 8th. (DSOF 100). Mr. Bruner sent out a letter of representation on October 8, 2013. (DSOF 101). Mr. Bruner visited Plaintiff in person on October 9, 2013. (DSOF 104). On October 9, 2013, Mr. Bruner filed a GAP motion requesting that Plaintiff be released from jail. (DSOF 105). The motion was set to be heard on October 24, 2013. (DSOF 106). At the hearing on October 24th, the GAP motion was granted and Plaintiff was released from jail. (DSOF 107).

Mr. Bruner used both verbal and written communication with Plaintiff. (DSOF 108). (DSOF 109). Mr. Bruner opines that Plaintiff speaks very well. (DSOF 110). Mr. Bruner assumed Plaintiff understood him because Plaintiff would respond appropriately. (DSOF 111). Mr. Bruner recalls that at the first meeting the communication was primarily verbal. (DSOF 112). Mr. Bruner recalls that Plaintiff

verbally asked a lot of questions during the first meeting. (DSOF 113).

After Plaintiff was released from jail, the primary communication between Plaintiff and Mr. Bruner was written through e-mail. (DSOF 114). However, there were times that the two would meet in person and use both verbal and written communication. (DSOF 115). On October 29th, Plaintiff sent an e-mail to Mr. Bruner's secretary requesting an interpreter at their next meeting. (DSOF 116). Mr. Bruner responded that he did not think an interpreter was necessary because he had "communicated quite well at the jail and could always write notes." (DSOF 117).

On October 31, 2013, Mr. Bruner sent Plaintiff correspondence which also contained a copy of a plea agreement. (DSOF 121). The two met on November 5, 2013 to discuss the case including the plea agreement. (DSOF 122). The two communicated both verbally and written. (DSOF 123). Mr. Bruner was of the opinion that the communications were reasonable and effective. (DSOF 124). Plaintiff was unsure whether to accept the plea agreement. (DSOF 125). The two exchanged e-mails discussing the acceptance of the plea agreement. (DSOF 126). Again, Mr. Bruner thought the e-mail communication was reasonable and effective. (DSOF 127). Mr. Bruner opined that Plaintiff's e-mails were articulate and well thought out. (DSOF 128). Plaintiff admits that he communicated with attorney Bruner through e-mail and was able to understand the contents of the e-mail. (DSOF 149).

On November 13, 2013, Plaintiff filed a formal complaint with the Pima County Sheriff's Department. AMF ¶ 167. He complained that he was

not provided with an ASL interpreter when arrested, booked and incarcerated, and that the TTY machines at the jail did not work. Id. An investigation by the department concluded that its employees took "reasonable measures to communicate" with Plaintiff, and so no additional action was taken. AMF ¶ 168.

On November 15, 2013, Mr. Bruner filed a motion with the superior court seeking an interpreter for any meetings between the two. (DSOF 129). Mr. Bruner did not feel that an interpreter was necessary. (DSOF 130). The superior court denied the motion and stated that an interpreter was only required in court and not for meetings outside of court between counsel and the client. (DSOF 131). The court did provide interpreters at the court hearings. (DSOF 132). Mr. Bruner acknowledged that use of the interpreter sped up the communications but Mr. Bruner opined that use of the interpreter did not improve the quality of the communications. (DSOF 133).

In sum, summary judgment will be granted on the Section 1983 claim.

**G. Rehabilitation Act against County (Count III)**

A cause of action under 504 of the Rehabilitation Act essentially parallels an ADA cause of action. *Olmstead v. Zimring*, 527 U.S. 581 (1999). Importantly, in the prison context, both Title II of the ADA and 504 of the Rehabilitation Act must be applied with consideration to legitimate penological interests. *Gates v. Rowland*, 39 F.3d 1349 (9th Cir. 1994). To prevail on a claim that a prisoner's rights have been violated, the inmate must show that the challenged prison policy or regulation is unreasonable. *Pierce v. County of Orange*, 526 F.3d

1190 (9th Cir. 2008). Accordingly, the resolution of Count III mirrors the resolution of Count I.

## H.  State rules and statutes (Counts IV and V)

In Counts Four and Five of the Second Amended Complaint, Plaintiff alleges violation of the Arizona Civil Rights Act (hereinafter "ACRA") and the Arizonans with Disabilities Act, which is a subsection of the ACRA. These counts basically contain the same cause of action. Further, these counts are the same as the violations alleged in the ADA and Rehabilitation Act allegations. The courts have noted that analysis of the ARCA is the same as the standards under the ADA and Rehabilitation Act, since the Arizona statutes are patterned on the federal law and that federal law is persuasive. *Matos v. City of Phoenix*, 176 Ariz. 125 (Ariz. App. 1993). Since the analysis and standards are the same, Counts IV and V may be dismissed for the same reasons as dismissal Count I, ADA, and Count III, Rehabilitation Act.

Further, a private cause of action does not exist under ARS §12-242 since the statute does not provide a private cause of action and that when a state creates rights for an individual against the state, it is not bound to provide a remedy in the courts and may withhold a remedy in its entirety. *Guibault v. Pima County*, 161 Ariz. 446 (Ariz. App. 1989). Plaintiff does not address or distinguish *Guibault*. Instead, Plaintiff solely relies on *Cort v. Ash*, 422 U.S. 660 (1975). However, the Arizona Supreme Court has expressly rejected *Cort* and the federal standard for determining legislative intent in creating or denying a private right of action. *Guibault* at 157-58 (citing *Transamerica Financial Corp. v. Superior Court*, 158 Ariz. 115, 761

P.2d 1019 (1988)). Plaintiff did not counter Defendants' argument that he waived any rights under the statute by waiving his *Miranda* rights and agreeing to speak with Deputy Mitchell. Again any claims made in lieu of a criminal appeal are barred by *Rooker-Feldman*.

**RULING**

Based on the foregoing,

IT IS ORDERED that the Defendants' Motion for Summary Judgment (Doc. 52) is GRANTED on all counts. The Clerk's Office is DIRECTED to enter a Final Judgment in accordance with this Order in favor of Defendants. This action is dismissed with prejudice as to all claims, but for the claims made in lieu of a criminal appeal which are dismissed without prejudice as is required by *Rooker-Feldman*. This action is terminated.

IT IS FURTHER ORDERED that Defendants Pima County Sheriff's Department and Pima County Public Defenders Office are both dismissed with prejudice.

IT IS FURTHER ORDERED that the Motion to Strike (Doc. 53) the audio CD is GRANTED. The Clerk's Office is DIRECTED to HOLD the audio CD (Doc. 52, Ex. 3) (DSOF, Ex. 3, a hard copy of the audio CD marked Exhibit 3 to the Separate Statement of Facts in support of the Motion for Summary Judgment. Ex. 3 was not considered by the Court in rendering this Ruling) as part of the record in this action for purposes of appellate review.

IT IS FURTHER ORDERED that the documents delivered to Chambers for in camera review to resolve a discovery dispute as directed by a Civil Minute Order (Doc. 48) are to be HELD by the Clerk's Office as

part of the record in this action for purposes of appellate review. Those documents accompany this Order.

IT IS FURTHER ORDERED that the documents delivered to chambers (Doc. 47) for in camera review to resolve a discovery dispute as directed by a Civil Minute Order (Doc. 49) are to be HELD by the Clerk's Office as part of the record in this action for purposes of appellate review. Those documents accompany this Order.

IT IS FURTHER ORDERED that the Motion to Strike (Doc. 64) the supplemental statement of facts is GRANTED. The supplemental statement of facts (Doc. 61) was filed without leave of Court and will be STRICKEN as such.

Dated this 9th day of August, 2017.


Honorable David C. Bury
United States District Judge